# Jonathan Dictrow Adv.



050-7920055
jonathan@copylawyer.co.il
www.copylawyer.co.il

June 10, 2019

To Whom it May Concern,

At the request of Herzog Fox & Neeman Law Firm, I hereby provide the following declaration:

# CERTIFICATE OF TRANSLATION

I, advocate Jonathan Dictrow, holder of Israeli ID 035678168, from 26 Ellifelet Street, Tel Aviv-Yafo, Israel, do hereby declare as follows:

1.  I am and have been a member of the Israel Bar Association since December 2006, license no. 44749.
2.  I hold an LL.B. degree from the Interdisciplinary Center, Herzliya, Israel.
3.  I have been working as a legal translator specializing in Hebrew-to-English and English-to Hebrew translations for more than 10 years.
4.  Previously I worked 3 years in corporate and international law practice.
5.  During the month of June 2019 my office "COPYLAWYER" executed translation of the following documents from Hebrew into English:
    –   Statement of Counterclaim in Civil File 38433-01-19 Cortica Ltd. v. eNitiatives IP Ltd. et al.
    (hereinafter: the "**Translation**").

6.  The Translation was executed to the best of my ability, knowledge and belief as a true and accurate translation of the original.

Sincerely,
Jonathan Dictrow

**The District Court**                                                          **Civil File 38433-01-19**
**of Tel Aviv-Yafo**                                        **Before the honorable Justice O. Maor**

**In the matter of:**          **Cortica Ltd.**

By counsel Advocates Dr. Gilad Wekselman or Uriel Mozes or Eddie Levdansky *et al*

Herzog, Fox, Neeman & Co., Advocates

Asia House, 4 Weizmann Street, Tel Aviv - Yafo 6423904

Tel: 03-6927424; Fax 03-6966464

**The Counter Plaintiff**

- Versus -

1.     **eNitiatives IP Ltd.**

By counsel Advocates Jeremy Benjamin or Danny Dilbary or Tom Gal *et al*

Goldfarb Seligman & Co., Advocates

98 Yigal Alon Street, Ampa Tower, Tel Aviv - Yafo 4789141

Tel.: 03-6089803; Fax: 03-61031111.

**The Counter Defendant 1**

2.     **M&B IP Analysts Limited Liability Company**

A company incorporated under the laws of the State of New Jersey, USA

Entity ID: 0400634843

500 Headquarters Plaza, West Tower 7th floor

Morristown NJ 07960-7070, United States of America

Tel: +19082743111; Fax: +19082743113

**The Counter Defendant 2**

**Nature of the claim**: Contractual, tortious, pecuniary, unjust enrichment

**Amount of the claim**: ILS 20,000,000, for filing fee purposes.

# Statement of Counterclaim

Pursuant to Regulations 52 and 53(a) of the Civil Procedure Regulations, 5744-1984 (hereinafter: the "**Regulations**"), the Counter Plaintiff, Cortica Ltd. (hereinafter: "**Cortica**"), the defendant in Civil File 38433-01-19, hereby files a counterclaim to the honorable Court against eNitiatives IP Ltd. (hereinafter: "**eNitiatives**"), the plaintiff in Civil File 38433-01-19.

In the framework of the Statement of Counterclaim, Cortica also brings action against the Counter Defendant 2, M&B IP Analysts Limited Liability Company (hereinafter: "**M&B**"), this pursuant to Regulation 54 of the Regulations. eNitiatives and M&B shall jointly be referred to as the "**Defendants**".

On the basis of that set forth below, the honorable Court is requested to dismiss the claim filed by eNitiatives, to accept the Counterclaim, and to charge the Defendants to jointly and severally pay Cortica an amount of ILS 20,000,000. Additionally, the honorable Court is requested to charge the Defendants with Cortica's costs, including attorney fees.

All emphases in the document have been added by the undersigned unless explicitly stated otherwise.

## A.  <u>Introduction</u>

1.  This Claim revolves around most severe acts performed by the Defendants against Cortica, while breaching duties of fidelity, care, fairness and loyalty imposed on them. Over the duration of a decade (from 2008 until March 2018) the Counter Defendant 1, eNitiatives, purported to provide Cortica with patent registration services for more than 170 patent applications and ancillary services, while being assisted (since 2014) by the Counter Defendant 2, M&B.[1]

2.  In consideration for these services, Cortica paid the Defendants a total amount of **approximately USD 2,000,000 (!)**, in addition to options issued to eNitiatives to acquire Cortica shares. These are exorbitant amounts relative to the scope of services provided to Cortica and relative to customary amounts, most certainly when it has emerged *post factum* that the services that were rendered did not justify this scope of payment, or any amount close to such.

3.  The longstanding relationship between the parties was based on the trust that Cortica placed in the Defendants - notwithstanding the fact that Cortica's primary asset (a start-up company in the area of artificial intelligence) was its intellectual property, Cortica did not know how to protect this asset, and it relied on the Defendants. Cortica engaged eNitiatives for this purpose - which was supposed to advise Cortica on its intellectual property strategy, including recommending the number of patent applications to file and their form, based on the technological development of Cortica's products, with M&B acting as eNitiatives "arm" to file patent applications in the US. As described hereunder, **the Defendants were blatantly negligent and flagrantly breached such trust by acting for their own good at the expense of the nature and quality of the services provided to Cortica**.

4.  During 2017, the Defendants sent Cortica inflated invoices for staggering amounts totaling tens of thousands of dollars per month (there was even one month of more than USD 100,000 !), this in deviation from the undertaking made with respect to the annual budget required to protect Cortica's intellectual property. Concurrently, Cortica felt that the Defendants were not involving it in the registration processes and in material decisions related thereto, which gave rise to doubts and suspicion at Cortica with respect to those inflated invoices, as well as with respect to the nature of the applications and responses filed and the need for them.

---

[1] Prior to 2014, the year in which M&B commenced providing services relating to Cortica's intellectual property, eNitiatives was assisted by the law firm Myers Wollin LLC (hereinafter "**MW**"). It should be noted that any reference made to M&B should also be deemed referring to MW, insofar as the reference relates to services provided to Cortica until the date on which M&B replaced MW in providing services to Cortica, in 2014.

5.  In view of these doubts and suspicions, Cortica asked to clarify the meaning of these exorbitant charges and the manner that its intellectual property was being handled. Accordingly, Cortica engaged an external advisor in the patent sector who examined whether the filed patent applications and the patents obtained in such respect were necessary, as well as the nature and quality of such applications and patents.

6.  **This examination uncovered most serious findings.** In reality, it emerged that throughout the duration of the entire period and particularly in recent years, the Defendants **exploited Cortica, literally**, unlawfully enriched themselves at Cortica's expense, systematically deceived it, and caused it great damage through negligent and blatantly unprofessional conduct in the framework of the services.

7.  As shall be described below, eNitiatives worked with a fee structure model based on "milestones". This model created a conflict of interest between Cortica's interests to receive protection that is as broad and long-term as possible for the technology it developed, and eNitiatives' financial interest to charge fees as high as possible. M&B also had an interest in filing as many patent applications as possible in order to charge fees for such. It became clear to Cortica that the Defendants had succumbed to temptation, and acted in complete contrast to Cortica's interest as a client, in order to inflate the fees they could charge Cortica. For example:

    7.1.  The Defendants adopted a "copy-and-paste" method in drafting most of Cortica's patent applications and even **negligently filed approximately 70% of Cortica's US patent applications (114 patent applications) as CIP (Continuation-in-Part) applications** and thereby severely harmed the scope and duration of protection granted for the patents. **As a result thereof, a significant number of the patents are entitled to less than 10 years of protection, notwithstanding that some of them could have enjoyed a period of protection of approximately 20 years;**

    This bizarre practice is irregular and derived solely from such built-in conflict of interest - in this manner the Defendants were able to avoid much work in preparing independent patent applications. Furthermore, the Defendants knew that by filing CIP applications they increase the likelihood that the applications would be examined relatively quickly. In this manner, the Defendants ensured that they would quickly and easily achieve the milestones, and charge as high fees as possible in consideration for as little work as possible;

    7.2.  The Defendants filed dozens of patent applications, while artificially splitting them into separate applications, in order to increase their revenues through increasing the number of applications and thereby achieve more milestones, all the while that it was possible to submit them in a consolidated manner and reduce Cortica's costs.

8.  The Defendants, who were meant to protect, advise, maintain, file and handle Cortica's intellectual property, acted **negligently** *vis-a-vis* Cortica's patent applications and everything entailed therein:

    8.1.  Especially in the last few years, the Defendants did not consult, did not present the full picture, did not explain, and, by and large, did not involve Cortica in the registration processes and in major

4

decisions regarding its portfolio of patents, while breaching ethical duties, fiduciary duties, and professional duties. All this was done on a plethora of issues, such as responding to USPTO office actions, filing patent applications, extension applications, abandoning and reducing patent claims, **in one extreme case they even abandoned a patent application**, and in another case they failed to convert a provisional patent application to a regular patent application - such that the provisional patent application expired without a regular patent application being filed that would benefit from the priority date granted to the provisional application, while causing significant harm to Cortica. All the aforementioned - without receiving Cortica's approval;

8.2.   The Defendants failed to warn of any problems, did not propose plans of action and did not properly handle all patent applications, and did not perform what was required of them with respect to the manner of formulating patent applications;

8.3.   The Defendants **failed to implement significant changes necessitated by new case-law handed down by the US Supreme Court** as well as various rulings and decisions of the USPTO **regarding software patents**, which caused many office actions for various patent applications, some of which were difficult and even impossible to overcome (in light of the amateur and negligent drafting of the patent applications). This negligence forced Cortica to deal with the office actions (fees for responding to these office actions were charged in full). Additionally, at least some of Cortica's patents became unenforceable and/or exposed to cancellation proceedings and/or indirect challenge through infringement claims. This is aside from the fact that the Defendants exposed Cortica's new ideas which were meant to be defensible, had they been properly drafted in the filed patent applications;

8.4.   the Defendants **drafted some of the patent applications** in a manner that was negligent and grossly unprofessional **whereby it is impossible to understand what technology is protected by the patents** - which also exposes these patents to cancellation proceedings and indirect challenges;

8.5.   eNitiatives presented itself, *inter alia*, as an expert in developing protection strategies, appraising and commercializing inventions, however, in reality eNitiatives and M&B failed tremendously in developing such strategy. Even the appraisals that were made emerged as being inflated due to the negligent conduct, as set forth above and in great detail hereunder, including with respect to the incorrect development of the patent portfolio, in such a manner that made its commercialization challenging.

9.   It should be noted that the negligent omissions and acts described above, **caused Cortica severe damage estimated at <u>tens of millions of shekels, at least</u>.**

10.   Furthermore, as Cortica only learned *post factum*, the Defendants **breached the fiduciary duties** owed to Cortica when **(1) they <u>intentionally</u> concealed from Cortica**, over many years, the fact that more than 70% of its patent portfolio is comprised of CIP applications, as well as the meaning of filing patent applications in this manner (a shorter defensible period for the patents). eNitiatives also tried to continue

to conceal this when it was explicitly asked about such; **(2)** eNitiatives **intentionally misled Cortica**, when executing the most current and recent agreement between the parties (2016), in such a manner which supposedly grants it additional rights beyond those granted to it under previous agreements, notwithstanding the parties' consent whereby the 2016 agreement would reflect the previous agreements. On the basis of clauses achieved through real deception, eNitiatives is now claiming significant amounts of money from Cortica, in the framework of the principal claim.

11.   Another issue of no less importance, in which the Defendants also breached their fiduciary duties owed to Cortica, is that **in a significant part of the time during the course of the parties' relationship, no eNitiatives person <u>was authorized to provide legal advisement and services</u>**, and even M&B's manager, Mr. Michael Ben-Shimon (hereinafter: "**Mr. Ben-Shimon**"), who worked opposite Cortica over the years (first as an employee of MW and then as manager of M&B) - only qualified as a patent agent in 2012. Notwithstanding the aforementioned, the Defendants misled Cortica when they purported to provide it with legal advisement and services. It should be noted that such severe act explains, to a certain extent, the severe degree of negligence and unprofessional conduct related to the provided services.

12.   Furthermore, eNitiatives' fee model and the manner that it was formulated was meant to blur the fact that no eNitiatives' person was qualified, as aforementioned, as well as the fact that **Cortica would be "double" charged for the same exact work** - once by eNitiatives and a second time by M&B. For example, in various instances a particular patent application was only drafted by eNitiatives or only by M&B; however, Cortica was charged as if M&B and eNitiatives drafted the application "from scratch".

13.   It emerged that, **over the years, Cortica was charged inflated, double, and unnecessary fees amounting to hundreds of thousands of dollars for the services promised to it**. Rather than saving costs as presented and promised to it, Cortica paid increased and double fees rather than making one payment to one party. It should be emphasized that a significant share of the Defendants' actions, constitute a series of severe breaches of the ethical duties which apply to attorneys and patent agents.

14.   Once Cortica understood that it had been deceived over many years by professionals whom it had trusted, and who were supposed to protect its most important asset - Cortica's intellectual property, it announced the termination of its engagement with eNitiatives (and as a corollary to such also with M&B which operated through eNitiatives as aforementioned), and refused to pay them any payments whatsoever for the "professional" service provided to it.

15.   **Since the services provided to Cortica were of poor , negligent and amateur quality, while clearly preferring the Defendants' interests over those of Cortica, Cortica is bringing action against the Defendants to repay all amounts paid to them over the years, in their different capacities - <u>approximately USD 2 million</u>. Furthermore, Cortica is bringing action against the Defendants to compensate it for the damages caused by the Defendants to its intellectual property which Cortica estimates (conservatively) at approximately <u>USD 19 million</u>.**

6

## B. <u>The parties relevant to the dispute</u>

## B.1 <u>Cortica</u>

16. Cortica is one of the leading and most advanced companies in the world in the field of artificial intelligence. Cortica was established in 2007 as a startup, and since has developed unique platforms that are able to "learn" reality and autonomously create insights and operations for computerized systems. Currently, Cortica's primary operations are focused on the smart-city and autonomous vehicle sector.

   Cortica's extract from the Registrar of Companies is attached hereto as **<u>Annex "1"</u>**. Background about Cortica taken from Wikipedia and a number of news articles describing its operations are attached hereto as **<u>Annex "2"</u>**.

## B.2 <u>eNitiatives</u>

17. eNitiatives is a company which purports to provide services in the intellectual property sector, including developing protection strategies and portfolio development, drafting patent applications, appraising and commercializing inventions.

18. A number of persons relevant to this Claim act within eNitiatives: Mr. Reuven Marko, eNitiatives founder and CEO and its controlling shareholder (hereinafter: "**Mr. Marko**"). Mr. Marko is neither an attorney nor a patent agent; Mr. Ophir Marko, Mr. Marko's son, who qualified as a patent agent in Israel in 2013; Mr. Or Agassi, serves as an attorney and director of eNitiatives and who, to Cortica's best knowledge, only started working at eNitiatives in 2011 (hereinafter: "**Adv. Agassi**") in the framework of Heskia - Hacmun Law Firm (hereinafter: "**HH**"), within which eNitiatives operated at such time as a kind of patent department.

   eNitiatives' extract from the Registrar of Companies is attached hereto as **<u>Annex "3"</u>**.

## B.3 <u>M&B</u>

19. To Cortica's best knowledge, M&B is a company which operates in the patent registration field. M&B was established in 2014 by Mr. Ben-Shimon, who to Cortica's best knowledge was previously employed by the US law firm MW, and in the years prior to his employment at MW he was employed by eNitiatives.

20. Cortica met Mr. Ben-Shimon through Mr. Marko, when, to Cortica's best knowledge, he was employed by MW. eNitiatives provided Cortica with patent registration services in the US commencing from 2008 through MW when Mr. Ben-Shimon would personally handle Cortica's patents. Mr. Ben-Shimon qualified as a patent agent in the US in 2012, and established M&B in 2014. M&B replaced MW at such time and eNitiatives started using it to provide Cortica with the services.

   The search results for M&B from the website of the registrar of companies for the State of New Jersey is attached hereto as **<u>Annex "4"</u>**.

A printout from the USPTO website which demonstrates that Mr. Ben-Shimon only qualified as a patent agent in 2012 is attached hereto as **Annex "5"**.

# C.   The agreements between the parties

## C.1  Cortica and eNitiatives

### C.1 (I) 2008-2011 - the first agreement

21.   The relationship between the parties commenced in 2008 when Cortica and eNitiatives entered an agreement regulating the intellectual property services (including patent registration and intellectual property protection strategy) that eNitiatives should provide Cortica (hereinafter: the "**2008 Agreement**").

The 2008 Agreement (and its amendment) is attached hereto as **Annex "6"**.

22.   The engagement was made after eNitiatives presented itself as having the knowledge, expertise and authority to handle Cortica's intellectual property, which was then a newly established start-up (2007), while eNitiatives represented that it would save Cortica significant patent registration costs through its operating method (drafting the applications by itself and being assisted by a US firm).

23.   eNitiatives is the party that drafted the 2008 Agreement, as well as the other agreements (which we shall relate to further on), in a "sophisticated" manner, as follows:

24.   **Vague description of the services.** In order to conceal the fact that we were solely dealing with legal services which no person at eNitiatives was authorized to provide (interviews with inventors, drafting patent applications, drafting responses to office actions etc.) - in the agreements between the parties the services rendered were referred to by vague and bizarre names such as "IP Catalyst Services (IPCS)", "Protection Strategy", IP Scan and IP Audit processes and reports", and other completely made-up terms were also used, such as "PPD - pseudo patent document" (a euphemism for a draft patent application). It should be emphasized in this context that, at such time, Cortica did not know that eNitiatives and Mr. Ben-Shimon who at such time was not qualified as a patent agent, lacked the professional qualification to provide the services offered by eNitiatives.

25.   **Vague description of the fee components and milestones.** As shall be demonstrated in Chapter G hereunder, in reality, for each and every patent application, Cortica was charged a **double payment without any justification for the same exact work (drafting a patent application)**. eNitiatives was well aware of this and therefore made sure to also conceal the components of its fees, as follows:

Charging based on milestones - rather than working under the customary model of hourly charges or charges based on work actually performed, eNitiatives chose to charge Cortica based on the "stage" of the relevant application, regardless of the amount of time and effort actually invested in a particular job. This fee model, while using non-customary terminology, was meant: **(1)** to differentiate (clearly artificially) between the services provided by eNitiatives and the services provided by M&B, in order to

conceal the fact that such were the same exact services and to enable a double charge, and **(2)** as aforementioned, to conceal the fact that they were unqualified.

For example, in the 2008 Agreement, the cash component of the fees (which was vaguely referred to as "Cash Compensation" in order to conceal the fact that such were "Professional Fees") appears as follows:

> **"I. Cash Compensation**
> **At each one of the following milestones eNitiatives shall be entitled to the compensation listed below (the "Milestone Fee"):**
> **Submission of PPD** [pseudo patent document - the undersigned] **to patent attorney/agent or provisional (MS 1.0) - $2,000**
> **Filing of the patent with a patent office (MS 2.0) - $2,000**
> **Allowance if a patent by the respective patent office (MS 3.0) - $3,000"**

26.  The outcome of this process was that Cortica in actual fact paid twice for each patent application, both to eNitiatives and also to M&B. As shall be described below, Cortica was forced to pay inflated, exaggerated and unnecessary amounts, due to this fee mechanism which is not dependent on the nature or quality of the patent applications, or the amount of working time actually invested in every patent application, rather only on the volume of applications and the "stage" of each application.

## C.1 (II) 2011-2016 - the second agreement - eNitiatives "joins" HH law firm and operates from within it

27.  eNitiatives understood well that it was forbidden under law to provide legal services without being appropriately qualified as attorneys or patent agents. Therefore, in 2011, it joined the HH law firm, and made sure Cortica execute an agreement built off the 2008 Agreement, only this time with a law firm being added as a party, and while eNitiatives rationalizing this by the fact that it had expanded the scope of its operations (hereinafter: the "**2011 Agreement**").

The 2011 Agreement is attached hereto as **Annex "7"**.

28.  The 2011 Agreement is similar to the 2008 Agreement, however, in order to understand eNitiatives' conduct, the special condition in Attachment I to the 2011 Agreement should be noted. Under this clause, in the event a need for special consulting with eNitiatives shall arise on a matter regarding an increase in the value of the patents, eNitiatives (which was not a party to the 2011 Agreement) shall be allocated, as consideration, options in Cortica, in accordance with the milestones.

29.  It should be emphasized, that in reality the options were allocated to eNitiatives in accordance with each milestone **for each patent application filed during the term of the 2011 Agreement**, exactly like before and after such, without any connection to whether eNitiatives's "expertise" was or was not "required" for increasing the value of the inventions, completely contrary to the provisions of the agreement.

30. This indicates that the manner in which this clause was drafted was intended to conceal: **(1)** the fact that eNitiatives provides legal services without qualification; **(2)** a partnership and/or prohibited distribution of profits between HH law firm and a party that is not a law firm (eNitiatives), contrary to the Bar Association Rules (Professional Ethics), 5746-1986 (hereinafter: the "**Ethics Rules**"), and the Bar Association Law, 5721-1961 (hereinafter: the "**Bar Association Law**").

31. On February 28, 2013, **and at Cortica's express request**, HH and Cortica executed an amendment to the 2011 Agreement, which included an addition to the special condition. Such amendment limited the total number of shares eNitiatives shall be able to exercise into options to 0.5% of Cortica's share capital, as follows:

> **"Furthermore, subject to the below acceptance by both Cortica Ltd. and eNitiatives, we agree to have the Letter of Engagement modified so that <u>an overall cap of 0.5% of the outstanding shares of Cortica shall be set for the holding of eNitiatives in Cortica</u> and that the "then known price per share" shall be fixed at US$ 65 per share for any shares not issued to eNitiatives to date, and be in effect until such time that the "known price per share" is determined at a new round of investment into Cortica."**

The amendment to the 2011 Agreement dated February 28, 2013 is attached hereto as **<u>Annex "8"</u>**.

## C.1   (III) 2016 agreement - Adv. Agassi intentionally misleads Cortica, his client, when executing the agreement

32. After Mr. Ophir Marko qualified as a patent agent in Israel, eNitiatives was no longer required to hide behind HH law firm, and, apparently as a result of which, decided to separate from it and become independent. On December 21, 2015, Adv. Agassi sent Cortica's CEO, Mr. Igal Raichelgauz, the following two agreements for execution: **(1)** a document terminating the agreement with HH; and **(2)** a new fee agreement, in which eNitiatives again directly engages with Cortica (hereinafter: the "**2016 Agreement**").

In this email, Adv. Agassi presented the change as a technical issue, and noted that in reality such is the same agreement, other than the confidentiality appendix thereto:

> **"...<u>basically follows the text of the previous agreement</u>, but also include[s]a confidential disclosure clause and agreement..."**

On December 27, 2015, Adv. Agassi sent a reminder email, and in such he also noted that they were dealing with the same agreement:

> **"Can we please take care of this? <u>The agreement matches our older one besides the change of our entity</u>"**

The email from Adv. Agassi dated December 21, 2015 with all of its attachments, and the reminder email dated December 27, 2015 are attached hereto as **Annex "9"**.

33. **However, Adv. Agassi apparently "forgot" to note that there were <u>many and material changes</u>** between the draft agreement he sent and the 2011 Agreement and its amendment. For example:

   33.1. Adv. Agassi **"forgot" to include in the 2016 Agreement the clause that limits the total options and/or shares that eNitiatives can accrue to 0.5%** of Cortica's total capital. This, notwithstanding, that as aforementioned, this clause was included in a special amendment to the 2011 Agreement and at Cortica's explicit request;

   33.2. Adv. Agassi "forgot" to note that the 2016 Agreement includes acceleration in the event of termination of the agreement, while in the 2011 Agreement the acceleration only relates to an M&A event of Cortica's assets/shares;

   33.3. Adv. Agassi "forgot" to note that the 2016 Agreement includes a provision whereby the options shall only expire in the event of M&A or IPO, while prior to the 2011 Agreement the options expired under the conditions of Cortica's option plan (which allows 90 days to exercise the options following the termination of the services - see <u>Chapter C.1 (IV)</u> hereunder for more detail);

   33.4. Adv. Agassi "forgot" the clause that mandates prior approval for expenses exceeding USD 500;

   33.5. Adv. Agassi increased, at his own initiative, the charge for "milestone 3.5" (MS 3.5) from USD 1,250 to USD 1,500;

   33.6. Adv. Agassi "forgot" to include the IP Audit clause (periodic reports - see <u>Chapter E.5 (II)</u> below) in the agreement, which regulates the payment of "Milestone 1.0" (MS 1.0) to once annually.

34. Cortica's CFO, Mr. Asher Avital (hereinafter: "**Mr. Avital**"), who only joined Cortica that year, noted the existence of many discrepancies between the 2011 Agreement and its amendment and the agreement, and therefore contacted Adv. Agassi on March 9, 2016, **and unequivocally requested that he send an amended draft that reflects the previous agreements, as declared by him**, while he describes some of the differences between the 2011 Agreement and what was sent to him:

   > **"<u>Please make sure that all agreements are reflected in the new one</u>. Below are what we have found so far…"**

   A copy of Mr. Avital's email dated March 9, 2016 is attached hereto as **Annex "10"**.

35. The next day, March 10, 2016, Adv. Agassi sent a response, including an amended draft of the 2016 Agreement.

   A copy of Adv. Agassi's response email dated March 10, 2016 together with the amended version is attached hereto as **Annex "11"**.

36.   In response, on April 5, 2016, Mr. Avital sent another email to Adv. Agassi, in which he made **another, clear and simple request,** that he make sure that this time he include in the agreement the provisions that were in the previous agreements:

>   **"Please add the section for the cap. And make sure the wording remain as was before."**

37.   That very day, Adv. Agassi sent a response with another draft. In this email Adv. Agassi gives the following response:

>   **"Attached with the exact wording as before."**

The correspondence dated April 5, 2016 is attached hereto as **Annex "12"**.

38.   However, this time as well, notwithstanding Adv. Agassi's explicit confirmation that such draft had the exact wording, he only amended the changes noted by Mr. Avital in the email dated March 9, 2016, and this too only partially.

39.   In light of Adv. Agassi's declaration that such had the exact same wording, Mr. Avital was satisfied, and it was inconceivable to him that Adv. Agassi, as someone who represents Cortica and is meant to protect its rights - would deceive it once again after being caught red-handed.

40.   Accordingly, Mr. Avital instructed Ms. Liron Kishoni (hereinafter: "**Ms. Kishoni**"), who worked under him, to quickly review the amended agreement and to execute it. Ms. Kishoni quickly reviewed the draft, found one negligible difference and executed it; however, **she did not notice the two very significant differences remaining between the 2016 Agreement and the 2011 Agreement**, which we shall refer to below.

Correspondence between Ms. Kishoni and Adv. Agassi including the 2016 Agreement executed in Mr. Avital's name is attached hereto as **Annex "13"**.

## C.1 (IV) The outcome of the deception - options exercisable without a limit of time and acceleration payments for termination of the agreement

### Options

41.   Under the previous agreements (2008, 2011), eNitiatives was entitled to an allocation of options to acquire Cortica shares once per period (with a right of exercise of up to 0.5% of the value of Cortica's shares), this in accordance with Cortica's option plan and allocation approval by its board of directors (hereinafter: the "**Options Plan**"), and in accordance with a separate agreement for allocating the options that is subject to the options plan and calculated in accordance with milestones in the agreements between the parties. The last time Cortica allocated options to eNitiatives was October 15, 2014.

Cortica's Options Plan is attached hereto as **Annex "14"**. The options allocation agreement between Cortica and eNitiatives dated October 15, 2014 is attached hereto as **Annex "15"**.

42. As a party that was exposed to the Options Plan on a number of opportunities prior to executing the 2016 Agreement, through executing options allocation agreements which refer to the Options Plan and which rely on it, as aforementioned - eNitiatives knew well that Cortica only allocated options in accordance with the terms of the Options Plan, and is not permitted to issue options in a manner other than in accordance with the Options Plan without approval of its board of directors.

43. Section 10(a) of the Options Plan establishes that in the event of **termination of the agreement with a service provider** (eNitiatives) the options shall be exercisable for the duration of 90 days following the termination of engagement, and subsequently shall expire. Moreover, Section 10(c) of the Options Plan establishes that if **an agreement has concluded with a service provider for "cause"**, then all the options shall immediately expire. Among other things, "cause" includes:

> **"…(iv) any breach of the Optionee's fiduciary duties or duties of care towards the Company or of its Subsidiaries; including, without limitation, self-dealing, prohibited disclosure of confidential information of, or relating to, the Company or its Subsidiaries, or engagement in any business competitive to the business of the Company"**

44. In this context, one difference between the 2016 Agreement and the 2011 Agreement, which Adv. Agassi succeeded to smuggle in, while Mr. Avital relied on **his representation** that it was completely identical, is found in the special condition section, which **stipulates on the conditions of the Options Plan**. Adv. Agassi's addition, which was intentionally "inserted" by him in the center of the clause, is marked as follows:

> **"Special condition. Whereas the IPCS further requires consulting and resorting to industry and business specific knowledge which aims to increase the value of the inventions, you agree eNitiatives Business Consulting (herein after "EBC") will provide such services and will be entitled to compensation in the form of stock and/or options to purchase shares of Common Stock of Signee, on a per milestone basis, in an amount equal to the cash value of each such milestone divided by the then known price per share, with an exercise price that is the lesser of the then known price per share and the option price given to employees of signee, and fully vested (the "Equity"). Such Equity shall be granted no more than twice per calendar year and at any investment round. Such Equity shall remain exercisable, regardless of any termination, until the first to occur of: the closing of a merger of the Signee in or with another entity, the sale of all or substantially all of the shares or assets of the Signee, and the closing of an initial public offering of the Signee's securities. An overall cap of 0.5% of the outstanding shares of Cortica shall be set for the holding of eNitiatives in Cortica**

> **and that the "then known price per share" shall be fixed at US$ 65 per share for any shares not issued to eNitiatives to date, and be in effect until such time that the "known price per share" is determined at a new round of investment into Cortica."**

45. Not only was this wording not at all included in the previous agreements between the parties - rather, in practice, it is also **completely contrary to the terms of the Options Plan**, whereby eNitiatives shall have no right to options in the event of: **(1)** breach of its duties to Cortica (Section 10(c) of the Options Plan); or **(2)** the lapse of 90 days from the termination of the relationship between the parties if eNitiatives had not yet asked to exercise the options.

## Acceleration Payments

46. An additional clause that Adv. Agassi succeeded to smuggle into the 2016 Agreement regards acceleration payments. Under the 2011 Agreement, the relevant clause **does not include a payment for all the milestones in the event of termination of the agreement:**

> **"Notwithstanding termination of this Agreement for any reason, options and/or payments as detailed above shall still be granted and/or paid if: (a) disclosure of the patent by Signee and/or Signee's employee to the firm was made prior to the date of termination, and (b) the firm materially contributed to the preparation of the patent application prior to termination, and (c) filing of the respective patent application occurred within six (6) months of such termination."**

It should be emphasized that in the 2011 Agreement, further along that very clause, there is **specific reference** to payment of all the milestones; however, this **is only in the event of M&A** for all of Cortica's assets or shares:

> **"Upon merger or acquisition of all, or substantially all, of Signee assets (an "M&A"), all pending milestones as detailed above shall be deemed completed and therefore options and/or payments will be due immediately upon closing of the M&A…"**

Reading the section clearly demonstrates that the 2011 Agreement intentionally separated between two instances: the one case - termination of the agreement, in which not all the milestones are paid. The explanation for this is clear: there is no need to pay eNitiatives astronomical amounts of money (as eNitiatives currently demands - no less than USD 780,000 !) solely as an "exit clause", when the patents did not even achieve the milestones and sometimes when nothing was done; the second case - acquisition of all or most of Cortica's assets and shares (exit) - since such is a joyous event which injects much money to all involved parties, there was logic to agree that in this kind of event (and only in such kind of event) all of the milestones should be paid.

47. However, in the "corresponding" clause of the 2016 Agreement, drafted by **Adv.** Agassi, there is a very minor "addition" of three words:

> **"Notwithstanding termination of this Agreement for any reason, Equity and/or payments as <u>for all milestones</u> as detailed above shall still be granted and/or paid if: (a) disclosure of the patent by Signee and/or Signee's employee to the firm was made prior to the date of termination, and (b) the firm materially contributed to the preparation of the patent application prior to termination, and (c) filing of the respective patent application occurred within six (6) months of such termination."**

48. Note well: in Mr. Avital's email dated March 9, 2016 (<u>Annex 10</u> above), the issue of acceleration upon termination of the agreement was discussed by Mr. Avital and Adv. Agassi, while Mr. Avital clarified to Adv. Agassi that under the 2011 Agreement there was no "acceleration" in the event of termination of the agreement. Adv. Agassi however responded to Mr. Avital that such acceleration was indeed included in the 2011 Agreement (<u>Annex 11</u> above); but in such he severely and knowingly misled Mr. Avital.

49. **It should be noted that due to Adv. Agassi being a lawyer, Adv. Agassi is subject to an increased duty of care and fiduciary duty *vis-a-vis* his client. This, in addition to the general duty to conduct oneself in good faith in negotiations prior to executing an agreement, and in addition to the known principle whereby in the event of a dispute in the interpretation of a contract, it should be interpreted to the detriment of the party that drafted it - *a fortiori* when the drafting party is a <u>lawyer</u> standing before its client, while in our case also the 2011 Agreement was drafted by the HH law firm.**

50. On the basis of these sections, which were achieved through real deception, eNitiatives "calculated" most of the amount of the claim that it filed (Section 51 of eNitiatives's statement of claim with its sub-clauses). It should be emphasized that **Cortica only discovered these gaps in the 2016 Agreement *post factum* - after termination of the engagement between the parties.**

## C.2  MW and subsequently M&B - did not execute an agreement and the entire relationship was through eNitiatives

51. As aforementioned, the services were provided by eNitiatives, which from 2008 until 2014 was assisted by the MW law firm when in reality Mr. Ben-Shimon was the person who performed the services for Cortica at MW, despite the fact that he only qualified as a patent agent in the US in 2012. In 2014 Mr. Ben-Shimon left MW, and established M&B, which also handles patent registration. From such time, M&B replaced MW such that eNitiatives started providing Cortica with the services through M&B.

52. It should be emphasized, that at no stage was any agreement whatsoever executed between Cortica and MW, or M&B, since all of the work (including the professional work, calculating expenses, correspondences etc.) was done through eNitiatives.

53. One of the indications of the aforementioned is the fact that Cortica was not at all updated about the transition from MW to M&B but rather simply started receiving invoices from M&B rather than MW. After receiving the initial invoices, on July 2, 2014, Ms. Kishoni asked Adv. Agassi for an explanation about these M&B invoices, and whether this is in reality MW which changed its name. Adv. Agassi responded as follows:

> **"M&B IP Analysts is a new company that Michael established who replaces Myers Wollin"**

The correspondence dated July 2, 2014 regarding the transition from MW to M&B is attached hereto as **Annex "16"**.

54. This conduct, moving to another firm, another company, a separate legal entity, without asking Cortica anything at all, exhibits (like other indications) not only the fact that Cortica never directly entered an agreement with M&B which was an "arm" of eNitiatives and that matters were handled only through eNitiatives, but is also indicative of the manner that the Defendants conducted themselves with respect to Cortica, as described in great detail hereunder.

## D. <u>Inflated invoices - the Defendants did not meet the budgets undertaken by them</u>

55. In 2016 Cortica started receiving inflated invoices from the Defendants totaling USD tens of thousands of dollars per month, for a long list of patent applications. As shall be explained below, it emerged (*post factum*) that many of the applications were drafted hastily and negligently, and many were drafted as separate applications when there was no justification or need for such, all in order to generate a strong "output" of applications, and to create a source of revenue and pump money from Cortica. If this is not enough, most of the patent applications were filed as CIP applications and not as independent applications, something which only emerged *post factum* as described in <u>Chapters E and F</u> hereunder.

56. Initially, when the invoices arrived, Cortica's representatives expressed their dissatisfaction to Adv. Agassi and to Mr. Marko with respect to the lack of control over expenses and lack of planning associated with such (at such time they were not at all suspicious of negligent conduct and believed they were concerned only with Cortica's interests). Accordingly, on January 31, 2017, Mr. Avital demanded that Adv. Agassi prepare a **comprehensive plan** for Cortica (all inclusive, including fees and the payment to M&B), based on a monthly budget of USD 10,000.

57. On February 16, 2017, Adv. Agassi sent a budget plan of **USD 236,000** for the entire year of 2017 (approximately USD 20,000 per month), which also included M&B's fees and the USPTO fees.

A copy of the correspondence regarding the budget and the plan totaling USD 236,000 dated February 16, 2017 is attached hereto as **Annex "17"**.

58.     However, contrary to the agreed budget, Cortica continued to receive astronomical invoices. In an attempt to understand the reason for deviating from the budget, Mr. Avital again contacted Adv. Agassi and requested that he concentrate all the invoices received since the beginning of 2017. Adv. Agassi sent a spreadsheet detailing all the invoices issued from the beginning of 2017 (January 11, 2017-March 22, 2017). **The total invoices for the period of less than three months, totaled approximately ILS 241,000 (approximately USD 66,000) this only for eNitiatives' services, without M&B and without filing fees!**

A list of the invoices from January 11, 2017-March 22, 2017 and the correspondence accompanying this list is attached hereto as **Annex "18"**.

59.     In order to put things in perspective, under the agreed budget, Cortica was only meant to pay eNitiatives USD 7,500 per month, such that the deviation described above is **3 times the agreed budget!**

60.     However, Adv. Agassi explained in an email that most of the invoices were issued prior to the demand to reduce expenses, and that he expects that the expenses will decline in Q2 2017 and even suggested holding a meeting. Notwithstanding, it can already be said that the budget **agreed** upon by the parties did not reflect reality, or anything close to it.

61.     After receiving the list of invoices, on April 4, 2017 Mr. Avital instructed **to stop** all activities, and requested to receive a working plan without filing new patents. Adv. Agassi exploited Mr. Avital's ignorance of patent law, and responded to Mr. Avital that in 2016 many provisional applications were filed **per Cortica's request**, and waiving the provisional applications and failing to convert them into permanent applications during 2017 would cause **rights to be lost and harm to Cortica**.

62.     It should be emphasized that such fact is **incorrect**: **(1)** naturally, like all technology companies, Cortica wanted to protect its technology in the broadest possible manner *inter alia* through registering many patents **which justify such**. This does not mean that Cortica wanted to artificially be a "patent factory" and file dozens of applications without a real need. eNitiatives needed to examine and recommend to Cortica which (and how many) applications should be filed **based on the technological development of Cortica's products and based on interviews with the inventors**; however, this was not done, and applications were filed which were sometimes not justified from the perspective of their value relative to registration costs, without any consultation and reflection of reality on this matter to Cortica; **(2)** in such context, expenses could have been avoided while still avoiding a "loss of rights" **through consolidating many applications** into one or several applications which would have saved tens of thousands of dollars, if not more; however, eNitiatives preferred submitting as many separate applications as possible in order to "inflate" the fees paid to it.

63.     Following such, on April 5, 2017 Adv. Agassi sent an updated (and inflated!) budgetary proposal of USD 384,000 for the entire year of 2017, assuming maintaining all the applications.

The updated (and inflated) budgetary proposal dated April 5, 2017 and accompanying correspondence is attached hereto as **Annex "19"**.

64. In light of these inflated amounts in the updated proposal, which deviate from the agreed budget by hundreds of percentages and which were unacceptable to Cortica, required Cortica to formulate a plan which would meet a reasonable budgetary target and which would protect its rights. In the framework of those discussions, eNitiatives represented that it is supposedly prepared to meet Cortica's requests by consolidating one of the milestones (the email attached as <u>Annex 4</u> to eNitiatives' statement of claim while withholding the correspondence on this issue presented here). This is an exceptionally negligible concession that does not even come close to the extraordinary gaps in the agreed budget and the astronomical amounts Cortica was demanded to pay.

65. Finally, on May 4, 2017, Adv. Agassi sent Mr. Avital a spreadsheet including recommendations - which applications to abandon and which applications to maintain or resubmit (again, Adv. Agassi did not disclose to Cortica the possibility of consolidating applications and saving expenses), together with forecasted costs for implementing the recommendations, all - in the framework of a budget of USD 221,000 until the end of 2017. In response, Mr. Avital verified that such was a budgetary proposal which reflects **all the expenses** until the end of 2017, for all the recommended patent applications. **Adv. Agassi confirmed that such amount covered all expenses and protected all of Cortica's rights**.

The budgetary proposal dated May 4, 2017 and accompanying correspondence is attached hereto as **Annex "20"**.

66. But, once again, completely contrary to what had been agreed, Cortica continued to receive invoices which did not even slightly bear any semblance to the approved budget (and its amendment). Thus, on June 7, 2017, Mr. Avital sent Adv. Agassi an email which concentrated all of the **invoices for May 2017 alone, totaling approximately USD 77,000 for M&B, and approximately USD 27,000 for eNitiatives - meaning a total of approximately USD 104,000 for one month! Such amount constitutes approximately half of the expenses until the end of the year, which had been agreed upon only one month beforehand, and as aforementioned this is only for one month!** It is clearly apparent that we are dealing with a very extreme deviation from what had been agreed upon by the parties.

67. Adv. Agassi again tried to "exclude" these invoices from the agreed budget with unacceptable explanations. Mr. Avital answered Adv. Agassi that the requested amounts are much greater than what was expected and agreed upon under the agreed budgetary proposals and asked him - whether these payment requests change the annual expenses in accordance with the updated budgetary plan dated May 4, 2017? **Adv. Agassi simply did not respond to this email**, because he apparently thought that the approach of exploiting the situation in order to continue cheating Cortica would continue to work.

The correspondence dated June 7, 2017 is attached hereto as **Annex "21"**.

68. On July 12, 2017, Adv. Agassi sent an updated budget totaling USD 180,000 from August 2017 until the end of July 2018. However, it once again appeared that there is no correlation between reality and the budget, and as a result of which, Cortica decided to suspend payment of all payment requests that were not approved and which were not within the budget.

The budgetary proposal dated July 12, 2017 is attached hereto as **Annex "22"**.

69. Subsequently, in November 2017, eNitiatives sent a budgetary proposal for 2018 totaling USD 335,000, and a request for payments which Cortica refused (rightfully so) to pay in 2017, totaling USD 120,000, due to eNitiatives's deviation from the agreed budget.

70. This inflated proposal was almost twice as high as the last proposal from July 2017. When sending this inflated proposal, eNitiatives (and M&B) knew well, that there was no chance that Cortica would agree to it, such that once again we are dealing with a baseless attempt to extract funds from Cortica. **It should be noted that the total amounts Cortica was requested to pay for 2017 reached the astronomical amount of <u>USD 508,000 !</u> Meaning <u>more than double the agreed budget</u>**. Obviously, Cortica decided that it would not pay the amounts deviating from the agreed budget.

   Correspondence regarding disagreements during the period from January-March 2018 is attached hereto as **Annex "23"**.

71. When Cortica saw that this is the situation, it instructed the Defendants to refrain from filing new applications, and that any action related to existing applications only be taken after receiving prior written approval, and concurrently decided to perform an external examination of the Defendants' conduct.

72. In light of the outcome of this examination as set forth in <u>Chapter E</u> hereunder, in which Cortica first discovered the truth about the Defendants' negligent and deficient conduct, Cortica informed eNitiatives that it is no longer interested in receiving services from it and that it is terminating the engagement with it, and demanded that it send all material in its possession regarding Cortica's patent portfolio to another firm.

## E. <u>Cortica's external examination discovered negligent and clearly unprofessional work by the Defendants, which caused severe damage to Cortica - leading to the termination of the relationship between the parties</u>

73. As foregoing, concurrently with the period in which Cortica received inflated bills, Cortica heard from the Defendants less and less on a professional level, meaning that Cortica received more bills while the Defendants started working more and more at their own initiative – inventors were hardly interviewed about new inventions, drafts were not sent, approvals were not requested for the actions performed, such as responding to office actions, filing patent applications, abandoning and reducing claims, etc.

74. This conduct, together with the lack of control over expenses, led Cortica to suspect something was not being managed properly, and it decided to hire external service providers to examine the Defendants' work in terms of the quality of the work relative to the fee, and as part of this to check whether there is any need for so many applications and responses, which were filed in the vast majority of cases at the initiative of eNitiatives and/or M&B alone.

75.  This examination, following which Cortica decided to terminate the relationship with eNitiatives, **revealed a series of serious omissions and negligent acts by the Defendants,** in violation of almost every possible duty, part of which were deliberately hidden from Cortica for many years, as detailed below:

## E.1. 114 CIP applications (!) over more than a decade (mostly from 2012 or later) - which reduced the period of protection over completely innovative technologies that justified new and independent patents

### E.1 (I) More than a decade of CIP applications, completely contrary to Cortica's interests – whereby depriving Cortica of many years of protection over new technology

76.  An examination of Cortica's patent portfolio in the US reveals the following findings:

76.1.  Cortica has 172 applications or registered patents (hereinafter, jointly, for the sake of convenience: **"Registrations"**) filed by eNitiatives since 2008; of which 161 Registrations in the US;

76.2.  Out of 161 Registrations in the US - **there is a very limited number of parent patents**, most of which were filed between 2006 and 2008;

76.3.  Out of 161 Registrations in the US - **no less than one hundred and fourteen (114) applications are CIP applications (!).** This constitutes approximately **70% of the US portfolio;**

76.4.  **All 114 CIPs, including patent applications filed in 2017(!) are linked to parent patents which were filed more than a decade ago. In other words, there are patent applications which were not yet granted, which are expected to receive less than ten years of protection;**

76.5.  96 of the 114 CIP applications were filed from the end of 2012. All of these, without exception, will benefit from less than ten years of protection.

77.  To understand the omissions and severe negligence in the Defendants' actions in building a portfolio of this kind, which relies mostly on CIP applications, we must understand what a CIP (Continuation in Part) application is, what it is designed for, what are its advantages and disadvantages, when it should be used, and most importantly - when it should <u>not</u> be used.

78.  CIP applications are a practice unique to the United States, and their main advantage is that the first patent application (the parent patent application) is not considered prior art with respect to a CIP patent that includes new information that was not included in the parent patent application.

79.  <u>For example</u>: Let us assume that a certain company developed a certain product and filed a patent application for it (hereinafter: the **"Parent Patent Application"**). Meanwhile, after the filing date of the Parent Patent Application, the company develops some kind of <u>technological improvement in the product for which the Parent Patent Application was filed</u> (hereinafter: the **"Technological Improvement"**). The

Company can file a CIP patent application **protecting the Technological Improvement** (new matter) – so that the Parent Patent Application does not constitute prior art against it.

80. In order to enjoy the main benefit of the CIP application, it must be filed **no later than one year** of the date of publication of the Parent Patent Application – this time limit is rigid. If the CIP application is filed <u>after</u> a year has lapsed, then the main advantage of the CIP is annulled, and the Parent Patent Application (like other publications from the period of the Parent Patent Application) may serve as prior art, thereby causing the cancellation or reduction of patent claims in the CIP application – whether in the course of the CIP application's examination by the US Patent Office or in the period after receiving the CIP patent.

81. Additional advantages of CIP applications are that these are usually examined in a shorter period of time by the US Patent Office, and in many cases require less work (on the part of law firms/patent agents).

82. **However, the main advantage of the CIP application comes at a "hefty price" - the patent's period of protection (if granted) is measured from the filing date of the Parent Patent Application, and not from the filing date of the CIP patent application, so that the <u>period of protection for a CIP patent is necessarily shorter than that of an independent patent.</u>**

83. It is emphasized that in case of a CIP patent application which requires a priority date from a <u>chain</u> of patent applications, the protection period of the CIP patent (if granted) shall start on the date of the first application in this chain. Thus, for example, US Patent US9466068B2, which was filed as a CIP application in 2015 (internal ref. no. COR-108), is linked (by a chain of six CIP applications) to a Parent Patent Application from 2006 - will benefit from a protection period that begins in 2006, and therefore the protection period of the patent shall only be 11 years - instead of 20 years.

84. Therefore, when a CIP application is not filed within the strict time limits, not only can it not benefit from the advantages of a CIP application (examination in light of prior art that existed in the period of the Parent Patent Application), but it also causes substantial damage to the patent owner, since the patent owner pays "a hefty price" in the form of reducing the patent's protection period (if granted) – for no reason.

85. This is a very unusual portfolio which, on the face of it, proves severe negligence and defects on all matters relating to the Defendants' conduct.

**<u>E.1. (II) Cortica's core technology has changed – but the Defendants did not bother to adjust the wording of the change applications – and filed almost no new independent applications, but continued mainly to file CIP applications linked to applications filed more than a decade ago, thereby shortening the protection of new inventions</u>**

86. Cortica's core technology includes creating a unique representation (signature) of natural signals, such as a photo, enabling identification, classification and sorting objects, behaviors, patterns etc.

87. Let us take, for example, <u>a car that is taking a video of its environment</u>:

87.1.   The environment includes different objects (such as – other cars, pedestrians, roads, buildings, traffic lights, crosswalks, etc.);

87.2.   Identifying the various objects starts with creating a signature of the environment (based on the environment's image);

87.3.   The environment's signature is compared to databases (concepts) which were already attributed to various types of objects. For example: one database represents a car of a certain model, a second database represents pedestrians, a third database represents crosswalks.

87.4.   The comparison's results provide information on the objects in the environment.

88.   Creating the databases (concepts) is performed mainly autonomously and without guidance, requiring no human intervention. For example: The system is capable of autonomously processing a great number of pictures to create databases representing different objects. This method allows creating accurate databases independently of manual processing (such as tagging objects) of the images. This method allows updating the databases dynamically and without human intervention.

89.   Cortica's core technology allows identifying objectives and is unsusceptible to obstructing objects, lighting, distance, change of angle, colors etc., and allows identifying the object in almost any situation.

90.   Starting from 2012, some of the foundations of Cortica's core technology changed in relation to the core technology in place between 2006 and 2008 (the years in which the parent patent applications were filed). Such changes include, *inter alia*, changes in creating the signature and changes in concepts.

91.   These material technological changes (especially in the field of the core technology) justified drafting new and independent patents which would receive 20 years of protection and be worded differently. These patents could even serve as parent patent applications for CIP applications to be filed within the rigid timeframe.

92.   However, the defendants <u>failed to include the material changes</u> in the wording of the patent applications, <u>and did not file new and independent patent applications protecting such changes</u>, and instead continued to file CIP applications using a "copy-and-paste" method, based on parent applications filed more than a decade earlier as foregoing – thus reducing the period of protection granted for the patent and without the relative advantage of CIP applications.

## E.1 (III) The many CIP applications were meant for obtaining lots of quick and easy money, in consideration for little work

93.   The Defendants drafted the CIP applications with a "copy-and-paste" method using information (even if not always relevant) from one or more parent applications, and added the technological improvement (new matter) negligently. There is no doubt that such (negligent) work is much easier and faster than drafting a patent application "from scratch", which certainly requires more effort in thinking and a much greater investment of time.

94. Therefore, the Defendants found it "easier" to continue with the "copy-and-paste" method, while in fact undermining the ability to protect technologies and applications for new concepts, which now receive fewer years of protection (sometimes 7 years and even less, instead of 20).

95. The reason for filing Cortica's patent applications by way of a CIP application, and the way in which they were drafted, demonstrate that the desire was to create a large number of applications quickly and thereby earn as much money as possible, as quickly as possible, while putting in as little work as possible.

96. **The fact that it is much easier to draft different applications (including CIP applications) in a negligent "copy-and-paste" method, and the fact that CIP applications are examined in a relatively fast proceeding (usually much faster than ordinary patent applications) were those considered by the Defendants, instead of Cortica's interest as a client.**

97. As detailed in Chapter C.1 above, the fee arrangement with eNitiatives was based on milestones. In other words, on "progress" in the registration proceeding according to stages and the number of applications. Therefore, eNitiatives had a clear interest to file as many patent applications as possible, to be examined as quickly and as easily as possible, and to achieve all milestones easily and quickly – **regardless of the "quality" and the duration of the protection which Cortica's patents receive in reality, and regardless of the effort invested (or not) in working on the patent applications**. This interest, of quick and easy enrichment, contradicted Cortica's interest to receive better protection for its patents for as long as possible.

98. M&B also "did not mind" charging the full fee as if these were independent patent applications, for many applications filed with the "copy-and-paste" method, making relatively minor additions (new matter only).

99. Apparently, the Defendants saw that it worked well for them, decided that Cortica is a production line for money (and options too, in the case of eNitiatives) in consideration for easy work – and they made a nice profit – **as opposed to Cortica** which paid a lot of money in consideration for patents that provided **weak and short-lived protection, and did not even know it was being deceived for years(!)**, as detailed in Chapter F below.

## E.2   The Defendants stopped involving Cortica in registration proceedings, including with respect to highly material decisions, while favoring their personal benefit over Cortica's interest

100. Like any professional providing services, a prerequisite condition which constitutes a professional and even ethical duty, is to submit to the client drafts for approval and comments, meet the client to explain the implications of any action, present it with alternatives and substitutes, consider together different wordings, and finally receive approval to perform material actions or actions requiring payment of money.

101. An examination of the Defendants' conduct demonstrates that at a certain stage they simple allowed themselves to disregard these basic duties, and acted in violation of the duties of care and professionalism

required from them. Below we shall detail some non-exhaustive examples of the Defendants' negligent acts and omissions in this context:

102. **They responded to patent examiners' reservations (office actions) without consulting Cortica, sometimes while significantly reducing claims without approval, thereby undermining the scope of protection over the patent.** Cortica received only invoices.

103. **They did not present Cortica with the possibility of filing consolidated applications or consolidating existing applications to reduce costs**. The Defendants acted in **severe conflict of interest** when they did not present Cortica with the option of consolidating applications highly similar to each other (we recall that a significant part of the portfolio is "copy-and-paste", with minor changes), into one or several applications, thereby saving tens and maybe hundreds of thousands of dollars. This is made even worse by the fact that Cortica demanded to stop and only work according to an orderly budget. The facts are clear – eNitiatives had an evident interest to file as many separate applications as possible, rather than one application consolidating everything, **since the fee was calculated by the number of applications and the milestones** reached by each application. M&B also had an interest to file as many applications as possible with as little work as possible, enabling charging a fee as if these applications were prepared "from scratch."

104. **Cortica was not sent application drafts for approval**. In the above context, it was for good reason that in dozens of cases, patent applications (both provision and non-provisional) were filed without Cortica approving the application draft, sometimes without Cortica even receiving a draft, and sometimes without Cortica even approving the filing of any application. Cortica received only the invoices, in better cases with the application that was already filed and in worse cases without a copy of the application. We can only wonder – how does a patent agent file a patent application without receiving the client's approval, and without knowing whether the patent's wording is up-to-date and accurate with respect to the client's technology?

105. **No discussions / meetings / presentation of alternatives were held**, regarding the wording of the patent applications, the manner of presenting facts therein, possible alternatives, advantages and disadvantages in drafting claims this or that way, and such basic matters expected from professionals in providing services of this type.

106. **Applications were converted from provisional to non-provisional without approval and without updating the application's content as expected**. In several instances, applications filed as provisional were converted to non-provisional, without consulting or asking Cortica. Here again, one of the main purposes of filing a provisional application is to **"benefit" from the priority date** granted by the provisional patent application, and also to **"benefit" from a year in which it is possible to improve and upgrade the invention under the application, and to update the non-provisional application**. Clearly, the conversion of a provisional application into a non-provisional application after one year, without making sure with Cortica that there were no improvements or upgrades in the year since filing the provisional application, is an unreasonable act (to put it mildly).

107. **They stopped interviewing inventors.** In the last two years of the parties' relationship (2016-2017), almost no inventors were interviewed regarding new inventions. This did not stop the Defendants from filing many dozens of new registration applications in these years. This conduct is strange and irregular, and significantly and adversely affected the wording of part of the applications, and the only reason for this is that inventor interviews (as opposed to filing applications) – were not prescribed a fee.

108. **A provisional application was filed in February 2017 (COR-210) and was simply "forgotten", until it expired in February 2018, without a regular patent application being filed a year later, thereby preventing Cortica from benefiting from the priority date of that provisional patent application.** Provisional patent applications expire one year after their filing. To benefit from the priority date granted by a provisional patent application, the provisional patent application must be converted into an ordinary, non-provisional patent application in the same year. The Defendants apparently "forgot" about the provisional application and it expired after one year. Needless to say, this is **pure negligence**, which caused unnecessary wasting of Cortica's money, and undermined the protection of its intellectual property. For the avoidance of doubt, it is emphasized that this application expired <u>before</u> the termination of the relationship between the parties. Moreover, eNitiatives explicitly undertook towards Cortica that it would convert this provisional application into a non-provisional application as part of the budget proposal dated July 12, 2017 (<u>Annex 22</u> above).

109. **They announced abandonment of patent application COR-088, which eNitiatives estimated in reports to be valued at USD 1-3 million(!), without approval or consultation.** The supposedly "professional" explanation provided *post factum* for abandoning patent COR-088, **completely contradicts "professional" conduct in other patents**. The Defendants argue that they believed that the claims in the application should not be reduced so that they include certain restrictions. However, in several other Cortica patents, the Defendants did not hesitate to reduce the claims in similar fashion, and did not abandon the application. In any case, clearly with respect to such a dramatic decision, the Defendants should have received Cortica's approval, taking into consideration the fact that we are dealing with a patent that they themselves appraised at USD 1-3 million (<u>Annex 24</u> below).

110. **M&B registered itself as the owner of PCT applications (international applications), which placed it in a conflict of interests.** This was done for no real reason, since it would have been possible to file PCT applications with the Israeli Patent Office or the International Patent Office (IB) - and this was also done without informing Cortica. This practice is utterly unacceptable.

111. We summarize by stating that the foregoing system of acts and omissions reflects conduct that is no less than outrageous, in every possible aspect. The logic is also that attorneys or patent agents work on behalf of and for their client and have no right or authority to act without the client's consent.

## E.3  The Defendants changed nothing in the manner of drafting the applications, even after significant transformation in US law with respect to software patents - which exposed the applications to rejection for the inventions being deemed an "abstract idea"

112. On June 19, 2014, the US Supreme Court handed down judgment in the **Alice Case**[2] which determined that <u>patent protection shall not be granted to a computer-implemented method</u> for exchanging financial obligations between two parties, using an intermediary third-party, which reduces the risk that one party to the financial transaction would not fulfill its obligations to its counterparty.

113. As a result, on June 25, 2014, the USPTO issued a precedential memorandum, that included examination guidelines in light of the judgment, stating that it should be examined whether the invention is deemed an abstract idea, in which case it shall not be eligible for a patent. In recent years, the USPTO issued several additional directives on this matter.

114. It should be noted, that the **Alice Case** and the resulting change in USPTO policy led to a significant reduction in the filing of patent applications in the field of software in the US, an increase in the number of office actions refusing to accept patents for registration on the basis of Section 101 of the US Patent Act, an increase in the rejection of software patent applications, and an increase in cancelation of patents in courts.

115. On May 26, 2016, judgment was handed down in the **Enfish Case**[3], which also dealt with software patents. In the judgment, a series of rules and tests were determined <u>for demonstrating an improvement in the functioning of computer software</u>, in order to overcome office action on the matter of an "abstract idea" by virtue of Section 101 of the US Patent Act.

116. **We would expect such dramatic shifts in US law with respect to <u>software</u> patents, to be addressed in some way by Cortica's representatives, a company that, as we remember, develops <u>software</u> inventions, <u>with respect to registering software patents</u> in the US. We would also expect that the manner of drafting the applications would change in accordance with the change in the law.**

117. However, the Defendants **<u>did not even bother to update</u>** Cortica on these dramatic shifts, and worse **<u>did not change anything in the manner of drafting the applications</u>**, and not only did the number of Cortica applications not decrease since 2014, it in fact increased significantly.

118. As a result, many applications filed by the Defendants were refused with reservations on the basis of Section 101 of the US Patent Act, and Cortica was forced to expend money to deal with these reservations in its attempt to register the patents. It should be noted that in some cases, it is impossible to overcome the reservations due to the basic faulty wording of the patent applications. In addition, some of the patents that were received are weak, difficult to enforce and exposed to cancellation proceedings.

## E.4  Many patent applications were drafted in an amateur and negligent manner, so as to render some of Cortica's patents unenforceable and exposed to

---

[2] **Alice Corp. v. CLS Bank International**, 573 U.S. 208, 134 S. Ct. 2347 (2014).

[3] **Enfish, LLC v. Microsoft Corp.**, 822 F.3d 1327 (Fed. Cir. 2016).

**cancellation proceedings and "indirect challenge" (even more so in light of the aforementioned judgments in the Alice Case and Enfish Case)**

119. As Cortica shall now demonstrate, a significant part of the patent applications and patents (most of them CIP, as provided in <u>Chapter E.1</u> above) are registered on a truly amateur level, and are plagued by a very long line of inaccuracies, which expose them to cancellation proceedings and/or "indirect challenges" in the framework of infringement proceedings:

120. <u>**Negligent wording in the "copy-and-paste" method**</u>. Sometimes the copy-and-paste material was not even relevant to the technology which the patent application purported to represent (for example, a patent referring to <u>image recognition</u> technology, while the attached figures to illustrate it refer to <u>sound recognition</u> (!) technology.

121. <u>**Drafting superficial, insufficiently detailed applications**</u>, sometimes with what appears like minimal investment of work.

122. <u>**Drafting patents negligently, so that they do not describe how Cortica's technology works or what exactly it consists of**</u>. For example, many patents state a general "wish list" of sorts, of how some of the components "should be" designed, instead of stating how the components were realized and implemented, as follows:

> **"Computational Cores Generation is a process of definition, selection and tuning the Architecture parameters for a certain realization in specific system and application. The process is based on several design considerations, such as:**
>
> **(a) <u>The cores should be designed</u> so as <u>to obtain maximal independence</u>, i.e., the projection from a signal space should generate a maximal pair-wise distance between any two computational cores' projections in a high-dimensional space.**
>
> **(b) <u>The computational cores should be optimally designed</u> for the type of signals, i.e. <u>the computational cores should be maximally sensitive</u> to the spatio-temporal structure of the injected signal, for example, and in particular, sensitive to local correlations in time and space.**
>
> **(c) <u>The computational cores should be optimally designed</u> with regard to invariance to set of signal distortions, of interest in relevant application."**

With all due respect, this is not how a patent is worded.

123. <u>**Wording by way of vague "incorporation reference" to other patents**</u>. Often with sweeping reference to patents which also vaguely refer to other patents, so that it is impossible to understand what the patent refers to exactly - all this without examining the compatibility between the referring patent and the referred patent.

124. **Vague, amateurish and even mistaken wording, from which it is impossible to understand what exactly is protected by the patent**. Just for an example: using the wrong terms, referring to the features of a product or method without explaining how the feature is achieved, lack of sufficient details, using relative and nonquantitative terms, failure to include terms appearing in claims in the application itself. All these expose the patents to cancellation proceedings or indirect attack - for example, by virtue of Section 112 of the US Patent Act.

125. **In the same context, wording that does not include implementation of the Alice Case and Enfish Case judgments regarding the accurate description of the improvement of the computer software's operation.**

126. **Wording reflecting old Cortica technology in patents that should protect newer Cortica technology**. As provided in Chapter E.1 (II), Cortica's technology changed over the years, but a large number of patent applications and patents do not reflect this, and are limited to the technology as it was between 2006 and 2008.

127. It is emphasized that this is a partial and non-exhaustive list.

## E.5   The Defendants failed to outline a correct and efficient strategy for protecting Cortica's intellectual property, and this negligent conduct also lead to a failure in appraising the patents

128. As we can see from the agreements between the parties (even in the agreement with HH), and as we can also see on the eNitiatives website at <www.enitiatives.biz>, it presents itself as a firm that: **(1)** builds and outlines intellectual property protection strategies; **(2)** provides appraisal and commercialization services for intellectual property, and patents in particular.

### E.5 (I) The "IP Protection Strategy" turned out to be an illusion

129. One of the purposes of Cortica's engagement with eNitiatives was for the latter to outline for Cortica a protection strategy for its intellectual property. In retrospect, Cortica discovered that eNitiatives, together with M&B, utterly failed to do so. This failure consists of two factors:

130. First, as detailed extensively above, the filing of dozens of applications which caused the waste of Cortica's funds and resources, in a most unprofessional manner and as CIP applications which shall for the most case expire already in 2025, a first-class strategic failure;

131. Second, not appropriately addressing developments in intellectual property laws in China – the world's second largest economy. Almost a decade ago, already, significant transformations took place in intellectual property law in China, including, *inter alia*, adjustment of China's intellectual property law to international treaties, and later on the establishment of special intellectual property courts in China (alongside stricter penalties for violators of intellectual property rights and significant compensation). Accordingly, China, which was well-known as an empire of imitation products and a country where

intellectual property rights are not enforced, slowly became a place where protection of intellectual property rights is advisable.

In particular, with respect to software patents, in October 2016, the State Intellectual Property Office (SIPO) in China published a directive according to which computer software, which was not considered until then eligible for protection as a patent, shall be considered eligible for protection. eNitiatives did state, at some stage, that it is necessary to file patent applications in additional countries, and mentioned China, however in verbal conversations Cortica was told that it is not economical to file patents in China. eNitiatives never updated Cortica on the significant changes that took place in China, and in any case, patents were never filed in China.

## E.5 (II) The Defendants' negligent and unprofessional conduct adversely affected the patents' value

132. Pursuant to agreements between the parties, eNitiatives would supply, on an annual/semiannual basis/at Cortica's request, reports on the status of Cortica's patents, to be presented before the board of directors and/or potential investors.

   Reports for example from 2015 and 2016 are attached hereto as **Annex "24"**.

133. In these reports, eNitiatives would provide Cortica with evaluations regarding the patents' financial value. In retrospect, Cortica discovered that in quite a few cases, the value of the patents turned out to be lower than appraised by eNitiatives.

134. The adverse effect to the patents' value derived from the Defendants' negligent conduct:

135. First, the weak protection of patents extensively described above – with respect to the scope of the protection, its quality (the ability to challenge it) and its duration – impair their value.

136. Moreover, they failed in creating a portfolio suitable for commercialization, which also directly affects the valuations.

137. We shall illustrate with an example, well-known to the Defendants: In 2017, Cortica was approached by Mr. Chris Sommers of ThinkFire, a firm specializing in IP commercialization, with the purpose of examining the possibility of purchasing part of Cortica's patents. Mr. Sommers even talked and conducted a correspondence with the Defendants. In his email dated October 27, 2017 to Cortica – **cc'd to Adv. Agassi and Mr. Ben-Shimon** – Mr. Sommers emphasized what they were also told verbally, that the manner in which Cortica's portfolio is constructed, as "one big family" of patents, makes it very difficult to commercialize the portfolio, and leads to a decrease in the patents' values.

   The correspondence with Mr. Sommers on the matter of patent commercialization is attached hereto as **Annex "25"**.

138. It should be noted that even after this criticism, the Applicants did not change anything and continued working in the same manner (until the termination of the parties' relationship a few months later). Moreover, in the aforementioned correspondences, we can see that Mr. Raichelgauz requested Adv. Agassi, twice, to receive some sort of response/explanation from him regarding the **vast gap** between the information presented by the Defendants over the years and the new (and real) information received from Mr. Sommers. **Adv. Agassi simply ignored this simple request made by Mr. Raichelgauz (twice), and again we can only wonder why.**

## F.   <u>For years the Defendants concealed from Cortica the fact that most of its portfolio consisted of CIP applications, and did not explain the implications of CIP to it</u>

139. An examination of the reports provided over the year with respect to the patents' status reveals that the Defendants hid from Cortica the fact that most of its portfolio consists of CIP applications (copies of reports from 2015 and 2016 are attached hereto as <u>Annex 24</u>).

140. For example, in a report dated September 6, 2015, only 19 applications appear as CIP, while at that time, 64 applications were CIP. In a report dated March 6, 2016, only 20 applications are termed CIP, while at such time, 64 applications were CIP.

141. Even worse – in the last report sent by Adv. Agassi in February 2018, **<u>only 3 out of 114 (!) applications were termed CIP,</u>** while the balance **– 111 applications – were termed Utility: Non-Provisional**, instead of stating that they were CIP applications.

   **This is a misleading name**, since it is customary to call a CIP application Utility: Continuation-in-Part (as was also performed in the February 2018 report, with respect to 3 applications out of 114), and not by the general name "non-provisional".

   The February 2018 report is attached hereto as **<u>Annex "26"</u>**.

142. Cortica received the February 2018 report on February 4, 2018, at the request of Cortica's COO, Mrs. Karina Odinaev. The first of the service providers hired by Cortica to examine the Defendants' conduct was an external patent agent, which saw the report and was **shocked** – both by the fact that there are so many CIP applications, and by the fact that Cortica was not even aware of this and was in fact misled for all these years.

143. The same patent agent then explained to Mrs. Odinaev the implications of CIP - **this is in fact the first time that anyone in Cortica understood the damage to the protection period resulting from filing a patent application as a CIP application!**

144. Following this, and after additional clarifications with several professionals, Cortica understood how severe the deceit was. In an attempt to receive some explanations, on March 6, 2018, Mrs. Odinaev sent an email to Adv. Agassi, to which she attached one of the applications (COR-179) as appears on the

USPTO website, and asked why it was presented in the February 2018 report as Utility: Non-Provisional rather than as a CIP application:

> **"I've been reviewing the docket you sent, and have the following question: <u>Cor179 appears as utility: non-provisional</u> in the docket file. <u>If I understand correctly, the actual application (attached) says its CIP, I would expect the docket to show this as a CIP</u>. Am I missing something?"**

145. In his response to Ms. Odinaev question, Adv. Agassi continued to try and deceive, and answered that in fact this was an independent application, that includes references to CIP as prior art only:

> **"In this case we mentioned several prior art items as references <u>although the disclosure itself is stand-alone</u> started as a provisional patent <u>application</u>."**

The correspondence between Ms. Odinaev and Adv. Agassi on the matter of the February 2018 report is attached hereto as **Annex "27"**.

146. From Agassi's statements it arises, that the same application claims a priority date only from a provisional application filed in 2016!

147. This is pure deceit. **Not only is COR-179 a CIP patent application, it is in fact a CIP application based on a chain of six CIP applications going back to a <u>2006 parent patent (this in addition to the provisional application from 2016)</u>.** The last thing that one could say about this application is that it is a **"stand-alone… application!"**.

COR-179 (US Patent Application no. US20180018337A1) is attached hereto as **Annex "28"**.

148. To explain, if COR-179 is granted, then as opposed to Defendants' argument, the period of protection would be counted from 2006, rather than from its filing date in 2017.

# G. <u>Double charges</u>

149. To understand the astronomical bills that Cortica received, it is important to understand that in fact, according to the work model in place between the parties, Cortica paid **twice, <u>without its knowledge, for the exact same work</u>**, both eNitiatives and M&B, in complete contradiction of the representation made by eNitiatives to it to begin with <u>whereby</u> the services that it provides it should save it money. <u>We shall illustrate this with an example</u>:

Let us assume that eNitiatives drafted a draft of a certain patent application and sent it to M&B for comments and/or filing etc. – i.e. MS 1.0 – **USD 2,500** according to the 2016 Agreement; at this stage, eNitiatives's work is in fact finished, and M&B goes over the draft, makes comments on it (including comments that are mostly technical and concern "phrasing", since eNitiatives is the one that is supposed to be in touch with the inventors – and sometimes no comments at all were given) and files it; in such a

case, Cortica pays eNitiatives **an additional USD 2,500** for the filing (MS 2.0), even though eNitiatives did not file the application itself and performed no action at this stage;

In addition, eNitiatives also paid a fee to M&B, at an amount more or less identical to MS 1.0 + MS 2.0 - **approximately USD 5,000** for "drafting patent application" and filing, as if M&B drafted the application itself "from scratch"; this amount still does not include charges and responses to examination reports and office actions, if any, and does not include the stage of receiving the patent (MS 3.0), for which eNitiatives collected **an additional USD 3,000** from Cortica, without performing any action (this is a decision by the USPTO patent examiner to accept the patent for registration).

**In other words, <u>approximately USD 13,000</u> (USD 8,000 to eNitiatives, another USD 5,000 to M&B), excluding office actions and expenses, and of course excluding the allocation of options to eNitiatives.**

150. **These facts are many times worse in light of the fact that most of Cortica's patents were written in a negligent "copy-and-paste" method** used by the Defendants, while filing over a hundred CIP applications that rely on a limited number of parent patents (Core Patents) as detailed in <u>Chapter E.1 (III)</u> above, so that the work in reality for most patents was very negligible and did not justify the inflated amounts.

151. Cortica started discovering these double payments only when the number of applications increased significantly, without its approval, and the amounts became astronomical as foregoing, and after external service providers examined their conduct on behalf of Cortica as detailed above.

# H.   The normative framework - causes of action

## H.1  The Defendants were grossly negligent in providing the services to Cortica, and caused it severe damages

152. The Defendants' actions as detailed above constitute **extreme negligence and/or a series of extreme omissions** pursuant to Sections 35-36 of the Torts Ordinance [New Version] (hereinafter: the **"Torts Ordinance"**), since reasonable legal advisors dealing with patent laws (attorneys/patent agents) should have been familiar with the material and practices of their occupation, and as a result:

152.1. The Applicants should not have filed 114 CIP applications over more than a decade, in a manner which most significantly shortened the period of protection to be received by Cortica's patents. In addition, the filing of the CIP applications exposed the patents to office actions/cancellation proceedings/indirect challenges. Moreover, the Defendants should have explained the implicants of CIP to Cortica;

152.2. The Defendants were supposed to get Cortica involved in the registration proceedings, and as part of this to send it drafts for comments and receive its approval for performing the various actions detailed above, certainly when dealing with actions such as abandoning or reducing claims, and *a*

*fortiori* abandonment of a patent application. The Defendants were not supposed to "forget" a provisional application and let it expire – but they acted in violation of all of the foregoing;

152.3. The Defendants were supposed to implement the changes in US law with respect to software patents but failed to do so: the Defendants should have drafted the patent applications professionally, as to reflect the changes in Cortica's technology, in particular in light of changes in US law as foregoing, but instead drafted the patents in a clearly unprofessional, vague and amateur manner, so as to make part of them unenforceable and exposed to office actions/cancellation proceedings/indirect challenges;

152.4. The Defendants were supposed to outline an efficient protection strategy for Cortica's intellectual property, correctly appraise the patents and build the portfolio as to allow its maximal and efficient commercialization, bur utterly failed to do so by filing 114 CIP applications, and build the entire portfolio as "one big family", in a way that does not allow separation and efficient commercialization of the patents and impairs their value. The Defendants also ignored explicit clarifications on this matter;

152.5. In addition, the Defendants failed in that they did not attribute any importance to transformations taking place in Chinese patent law.

153. The Defendants were negligent in purporting to provide Cortica with professional services, when in reality, for a long time, they were not even certified to provide such services.

154. eNitiatives was negligent when it misled Cortica with respect to the 2016 Agreement, in order to improve terms *vis-à-vis* Cortica.

155. The Defendants were negligent when they misled Cortica from understanding that it is in fact paying double (to eNitiatives and M&B) for each action they perform.

156. The Defendants were negligent when they preferred their personal interest over Cortica's interest.

## H.2 Negligent misrepresentation and fraud, fundamental breach of the Agreement or at least its performance in extreme lack of good faith

157. Deliberately concealing the fact that 70% of Cortica's portfolio consisted of CIP applications for years, and in particular the implications of CIP; Adv. Agassi's attempt to conceal this fact even after he was explicitly asked about it as foregoing; misleading Cortica with respect to the 2016 Agreement; misleading Cortica with respect to the double payments that the Defendants charged it; and misleading Cortica regarding the Defendants' ability to provide it with the services, even though they were not certified to do so – amount to negligent misrepresentation and even fraud pursuant to Sections 35-36 and 56-57 of the Torts Ordinance.

158. Moreover, the Defendants' conduct described in the Statement of Counterclaim above also constitutes a fundamental breach of the agreement between Cortica and eNitiatives, pursuant to Section 6 of the Contract Law (Remedies for Breach of Contract), 5731-1970 (hereinafter: the **"Contract Law – Remedies"**), and also lack of good faith in performing the contract between Cortica and eNitiatives, in violation of Section 39 of the Contract Law (General Part), 5733-1973 (hereinafter: the **"Contract Law"**).

## H.3  Deception and exploitation, lack of good faith in negotiating an agreement and violation of an attorney's fiduciary duties towards his client

159. The Defendants' conduct, and especially that of Adv. Agassi from eNitiatives, on all matters relating to Cortica's deception with respect to the 2016 Agreement, constitutes lack of good faith in negotiating the signing of an agreement, in violation of Section 12 of the Contract Law, as well as deceit and extortion pursuant to Sections 14 and 18 of the Contract Law. In addition, this conduct by Adv. Agassi violates the duty of acting fairly and in trust toward a client, pursuant to Section 2 of the Ethics Rules.

160. Misleading Corsica with respect to the Defendants' ability to provide it with professional service, including hiding the fact that they are not certified to provide such services, also constitutes lack of good faith in negotiating a contract.

## H.4  Severe conflict of interest and unjust enrichment

161. eNitiatives's fee model, which is not stipulated on the quantity of time or effort, or the quality of the patents, but on the number of applications that "progress" according to the milestones, as well as M&B's conduct, which collected for each CIP application money as if it were an application drafted "from scratch," created a clear conflict of interest for the Defendants, between their interest, of as many applications as possible to be filed and accepted for registration with minimal effort on their part, thereby collecting maximum fees, and Cortica's interest as a client to receive protection that is as extensive and as long as possible in its patents, with as little financial expenses as possible.

162. Therefore, the Defendants filed dozens of patent applications when sometimes there was no real need for them, without Cortica's approval, and did not present Cortica with the possibility of filing a consolidated application or consolidating a significant part of the existing applications, thereby saving expenses, but preferred to increase its expenses for no logical reason but their desire for unjust enrichment at Cortica's expense.

163. This constitutes prohibited conflict of interest pursuant to Section 14(a) of the Ethics Rules regarding attorneys, and pursuant to Section 146 of the Patent Law, 5727-1967 (hereinafter: the **"Patent Law"**), with respect to patent agents.

164. In this context, the number of applications filed using the "copy-and-paste" method, with minimal effort, together with the "double" charge for the very same work ("copy-and-paste" work with minor additions as foregoing) – only reinforces the above conclusions and makes it more serious.

165. The Defendants' conduct described above, the double charges, number of applications, decisions in conflict of interest meant to benefit their accounts for no justifiable reason at Cortica's expense, and amateurish and negligent conduct, especially in light of the severe conflict of interest that the Defendants acted in, constitute unjust enrichment as this term is used in the Unjust Enrichment Law, 5739-1979 (hereinafter: the **"Unjust Enrichment Law"**).

## H.5  Provision of legal services without any certification

166. At least until 2012, no person in eNitiatives was certified to provide legal services or advisement, whether general or in the field of patents, and the services provided to Cortica were in violation of the provisions of the Bar Association Law and the Patent Law. Even after the artificial "joining of forces" of eNitiatives and the HH law firm in 2011, Mr. Reuven Marko still provided Cortica with legal services without certification (to the best of our knowledge, Mr. Marko is not certified to provide such services even to the present day), and the only person certified to provide such services was Adv. Agassi.

167. Moreover, Mr. Ben-Shimon was also certified as a US Patent Agent only in 2012 (Annex 5 above), and therefore all of the services that he provided Cortica as part of the MW Law Firm were in violation of the American law on this matter. It is emphasized that Mr. Ben-Shimon was the one to provide the services in effect until his certification, even if he was not the one to "sign" on the applications and documents filed with the USPTO.

168. These facts explain the severe negligence described extensively above, since some of the base patents as well as many CIP applications on the basis of which the defendants "copied-and-pasted" over the years, as described above, were drafted when the Defendants were not certified as attorneys, patent agents or patent agents.

## H.6  Prohibited sharing and/or distribution of profits between an attorney and a person other than an attorney

169. In addition, the fact that eNitiatives joined the HH law firm and the distribution of the fee between them (in cash to HH and in options to eNitiatives), as detailed in Chapter C.1 (II) above, constitutes prohibited distribution of profits according to the Ethics Rules and the Bar Association Law.

170. The present employment of Adv. Agassi, who is employed by eNitiatives which is not a partnership of attorneys or law firm, but an "ordinary" limited liability company, providing legal services for a consideration, is also against the Ethics Rules. In addition, or alternatively, since Adv. Agassi is a director in eNitiatives, and possible also receives a percentage of its profits, he is performing a prohibited sharing of profits with a person other than a lawyer, in violation of the Association Bar Law.

## I.  Remedies

171. Pursuant to the foregoing, the honorable Court is requested to order the Defendants, jointly and severally, to pay Cortica the following amounts:

171.1. **USD 2,000,000** - Restitution of the fees paid over the years to the Defendants in their various roles (payment to eNitiatives, whether directly or through the HH law firm, and payment to M&B, whether directly or through MW). As described in detail in this Statement of Counterclaim, it arises that the Defendants provided amateur and unprofessional service, were grossly negligent causing severe damages to Cortica, charged it double charges, "inflated" the fee they collected from Cortica by splitting into many applications, and worked in the "copy-and-paste" method. Such a service is a clear and fundamental breach of the agreement, for which Cortica claims that it be returned the fee that it paid;

171.2. **ILS 7,000,000** - Compensation for the damages caused to Cortica as the result of the gross negligence in filing the patent applications, including the filing of 114 CIP applications, and the amateur and negligent drafting of the applications, which impaired the scope and duration of the protection of the patents, and exposed them to reservations/cancellation proceedings/challenges after acceptance or as part of infringement proceedings;

171.3. **USD 2,000,000** - Compensation for the damages caused to Cortica due to the abandonment of Patent COR-088 without Cortica's approval. This amount constitutes the average of Cortica's valuation according to which the COR-088 patent is worth between USD 1,000,000 and USD 3,000,000;

171.4. **ILS 5,000,000** - Compensation for the damages caused to Cortica due to the devaluation of the patents as the result of the Defendants' failure to build the patent portfolio, thus making its commercialization difficult.

172. For the purposes of the court fee only, Cortica sets its overall claim against the Defendants at the amount of ILS 20,000,000.

## J.  The Court is authorized to hear the claim

173. The honorable Court is authorized to hear this claim, both due to the fact that the agreement applicable to the claim exclusively authorizes it, as provided in Section 53 of eNitiatives's own claim, and due of the fact that we are dealing with a Statement of Counterclaim to a claim filed with the honorable Court.

174. The honorable Court is authorized to hear the action also with respect to M&B, which is a US resident company, as detailed in the Motion to Leave Service Outside the Jurisdiction, filed simultaneously with this Statement of Claim.

175. Pursuant to all of the foregoing, the honorable Court is requested to grant this Claim and all its reasons and causes, and to order as requested in Chapter I above.

176. In addition, the honorable Court is requested to order the Defendants to pay Cortica's costs, including attorney fees.

_____        _____        _____
**Dr. Gilad Wekselman, Adv.**                  **Uriel Mozes, Adv.**                        **Eddie Levdansky, Adv.**


**Herzog, Fox, Neeman & Co., Advocates**
**Counsels for the Counter-Plaintiff**